**No. 25-2278**
**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

IN RE: AVANDIA MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION

---

UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 AND
PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND
and J.B. HUNT TRANSPORT SERVICES, INC.

Plaintiffs-Appellees

v.

GLAXOSMITHKLINE LLC

Defendant-Appellant

---

On Appeal from the U.S. District Court
for the Eastern District of Pennsylvania
Case No. 07-md-1871, Judge Cynthia M. Rufe

---

**BRIEF OF APPELLEES**

---

Thomas M. Sobol
Erin C. Burns
Hannah W. Brennan
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
(617) 482-3700

James R. Dugan, II
David S. Scalia
THE DUGAN LAW FIRM, LLC
365 Canal Street, Suite 1000
New Orleans, LA 70130
(504) 648-0180

September 8, 2025

(Additional Counsel on Inside Cover)

David J. Zimmer
Edwina B. Clarke
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421

Julia A. Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
1629 K St. NW, Suite 300
Washington, D.C. 20006
(617) 676-9410

*Counsel for Plaintiffs-Appellees*

Eric L. Young
MILLER SHAH LLP
1845 Walnut St, Suite 806
Philadelphia, PA 19106
(866) 540-5505

*Counsel for Plaintiff-Appellee United Food and Commercial Workers Local 1776 and Participating Employers Health and Welfare Fund*

A.J. de Bartolomeo
KAPLAN FOX & KILSHEIMER LLP
1999 Harrison St, Suite 1501
Oakland, CA 94612
(415) 772-4700

*Counsel for Plaintiff-Appellee J.B. Hunt Transport Services, Inc.*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the Plaintiff-Appellees state as follows:

Plaintiff-Appellee United Food and Commercial Workers Local 1776 and Participating Employers Health and Welfare Fund (UFCW) has no parent corporations, and no publicly held company owns 10% or more of its stock.

Plaintiff-Appellee J.B. Hunt Transport Services, Inc. (J.B. Hunt) has no parent company, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................1

STATEMENT OF THE ISSUES...........................................................2

STATEMENT OF THE CASE...............................................................3

    I.    Facts...........................................................................................3

          A.    GSK marketed Avandia by touting its ability to reduce cardiovascular risk............................................3

          B.    GSK knew Avandia had significant, undisclosed cardiovascular risks.............................................4

          C.    The public's reaction to the Nissen study reveals what would have occurred in 2005 had GSK disclosed the truth: sales of Avandia would have plummeted.............................................7

          D.    GSK's misconduct led to FDA warnings, a congressional investigation, a guilty plea, and massive civil liability. ...............................9

    II.    Procedural History...............................................................11

          A.    This Court twice allows plaintiffs' RICO claim to proceed. ...............................11

          B.    The district court rules on *Daubert* motions and certifies the class. ...............................12

SUMMARY OF ARGUMENT ............................................................16

ARGUMENT ......................................................................................17

    I.    This Court may limit the scope of its review under Rule 23(f). ...............................18

i

II.    The district court did not abuse its discretion in finding
that common issues will predominate at trial.....................................23

    A.    The court correctly found that common issues
predominate because plaintiffs will present a class-
wide RICO claim using Nissen as a natural
experiment......................................................................................23

    B.    This Court's and other circuits' precedents support
plaintiffs' class-wide theory of injury.......................................31

    C.    GSK's brief misrepresents the district court's
decision in crucial ways. ............................................................38

    D.    GSK's internal marketing analyses and oral
statements provide class-wide support for
plaintiffs' RICO claim. ..............................................................44

    E.    To the extent GSK has any individualized defense,
it does not predominate. .............................................................46

III.    The Avandia TPP class is ascertainable.............................................48

    A.    Ascertainability neither requires presentation of all
records nor precludes individualized review. ...........................48

    B.    The district court's finding on ascertainability is
not clearly erroneous..................................................................52

    C.    Plaintiffs need not present all data now, and
individualized inquiry is no bar to certification.......................55

CONCLUSION.......................................................................................................61

CERTIFICATE OF SERVICE ..............................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACRA Turf Club, LLC v. Zanzuccki*,
  748 F.3d 127 (3d Cir. 2014) ......................................................................22

*In re Actiq Sales & Mktg. Pracs. Litig.*,
  2014 WL 3572932 (E.D. Pa. July 21, 2014) ........................................52

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
  804 F.3d 633 (3d Cir. 2015) (*Avandia I*) ...................................*passim*

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
  945 F.3d 749 (3d Cir. 2019) (*Avandia II*) .................................*passim*

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
  No. 09-cv-730, 2013 WL 5761202 (E.D. Pa. Oct. 23, 2013) ...........4

*In re Baby Prods. Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013) ....................................................................58

*Barbato v. Greystone All., LLC*,
  916 F.3d 260 (3d Cir. 2019) ....................................................................21

*Blair v. Equifax Check Servs., Inc.*,
  181 F.3d 832 (7th Cir. 1999) ..................................................................19

*Bridge v. Phoenix Bond & Indemnity Co.*,
  553 U.S. 639 (2008) ...........................................................................24, 39

*Byrd v. Aaron's Inc.*,
  784 F.3d 154 (3d Cir. 2015), *as amended* (Apr. 28, 2015) ...........49, 50, 58

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) ....................................................................58

*Carter v. W. Pub. Co*,
  225 F.3d 1258 (11th Cir. 2000) ..............................................................20

*Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*,
  145 S. Ct. 1000 (2024) ........................................................................ 19

*City & Cnty. of San Francisco, Calif. v. Sheehan*,
  575 U.S. 600 (2015) ............................................................................ 19

*City Select Auto Sales Inc. v. BMW of N. Am.*,
  867 F.3d 434 (3d Cir. 2017) ......................................................... 50, 53

*In re Comm. Bank of N. Va. Mort. Lending Pract. Litig.*,
  795 F.3d 380 (3d Cir. 2015) ......................................................... 23, 37

*Elliott v. Archdiocese of New York*,
  682 F.3d 213 (3d Cir. 2012) ............................................................... 18

*Facebook, Inc. v. Amalgamated Bank*,
  604 U.S. 4 (2024) ............................................................................... 22

*In re Flonase Antitrust Litig.*,
  284 F.R.D. 207 (E.D. Pa. 2012) ......................................................... 26

*Forsythe v. Teva Pharm. Indus. Ltd.*,
  102 F.4th 152 (3d Cir. 2024) ............................................................. 19

*Fox v. Saginaw County, Mich.*,
  67 F.4th 284 (6th Cir. 2023) .............................................................. 20

*In re Generic Pharms. Pricing Antitrust Litig.*,
  2025 WL 754567 (E.D. Pa. 2025) ...................................................... 59

*Gov't Employees Health Ass'n v. Actelion Pharms. Ltd.*,
  2024 WL 4122123 (D. Md. 2024) ...................................................... 59

*Griesmann v. Chem. Leaman Tank Lines, Inc.*,
  776 F.2d 66 (3d Cir. 1985) ................................................................. 21

*Hargrove v. Sleepy's LLC*,
  974 F.3d 467 (3d Cir. 2020) ................................................... 49, 50, 58

*Harnish v. Widener Univ. Sch. of Law,*
   833 F.3d 298 (3d Cir. 2016) ...........................................................23, 24, 37, 38

*In re Hydrogen Peroxide Antitrust Litig.,*
   552 F.3d 305 (3d Cir. 2008), *as amended* (Jan. 16, 2009) ...........................17, 52

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union,*
   22 F.4th 1125 (9th Cir. 2022) .................................................................21

*Johnson v. Alldredge,*
   488 F.2d 820 (3d Cir. 1973) ...................................................................21

*Johnson v. United States,*
   574 U.S. 1069 (2015)...............................................................................22

*Kelly v. RealPage Inc.,*
   47 F.4th 202 (3d Cir. 2022) ....................................................49, 51, 54

*Link v. Mercedes-Benz of N. Am., Inc.,*
   550 F.2d 860 (3d Cir. 1977) ...................................................................22

*In re Loestrin 24 FE Antitrust Litig.,*
   410 F. Supp. 3d 352 (D.R.I. 2019) .............................................53, 56

*Marcus v. BMW of N. Am., LLC,*
   687 F.3d 583 (3d Cir. 2012) ....................................................48, 49

*Microsoft Corp. v. Baker,*
   582 U.S. 23 (2017).................................................................................20

*Miller v. Bolger,*
   802 F.2d 660 (3d Cir. 1986) ...................................................................21

*Moore v. Walton,*
   96 F.4th 616 (3d Cir. 2024) .....................................................................18

*Moser v. Benefytt, Inc.,*
   8 F.4th 872 (9th Cir. 2021) ......................................................................20

*Murphy v. Heppenstall Co.,*
   635 F.2d 233 (3d Cir. 1980) ..............................................................21, 22

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   338 F.R.D. 527 (S.D.N.Y. 2021) .......................................................26

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap*
   *Antitrust Litig.*,
   958 F.3d 1239 (9th Cir. 2020) .........................................................26

*In re Neurontin Mktg. and Sales Practices Litig.*,
   712 F.3d 60 (1st Cir. 2013)..........................................31, 32, 39, 42

*In re Niaspan Antitrust Litig.*,
   67 F.4th 118 (3d Cir. 2023) .............................................................61

*In re Ranbaxy Antitrust Litig.*,
   338 F.R.D. 294 (D. Mass. 2021)......................................................59

*Resol. Tr. Corp. v. Cityfed Fin. Corp.*,
   57 F.3d 1231 (3d Cir. 1995), *vacated on other grounds sub nom.*
   *Atherton v. F.D.I.C.*, 519 U.S. 213 (1997) .......................................21

*In re Restasis Antitrust Litig.*,
   E.D.N.Y. No. 18-md-2819, ECF No. 396-4 (Oct. 9, 2019) ..............56

*Rivera v. Wyeth-Ayerst Lab'ys*,
   283 F.3d 315 (5th Cir. 2002) ...........................................................20

*Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-*
   *Aventis U.S. LLP.*,
   806 F.3d 71 (2d Cir. 2015) .......................................................*passim*

*Taha v. Cnty. of Bucks*,
   862 F.3d 292 (3d Cir. 2017) .............................................................20

*UFCW Local 1776 v. Eli Lilly and Co.*,
   620 F.3d 121 (2d Cir. 2010) .....................................................*passim*

*Waetzig v. Halliburton Energy Servs., Inc.*,
   604 U.S. 305 (2025)..........................................................................18

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   2020 WL 5778756 (E.D. Va. Aug. 14, 2020) .....................53, 56, 59

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  2021 WL 3704727 (E.D. Va. Aug. 20, 2021) .................................................53

**Statutes**

18 U.S.C. §1341 ...............................................................................................24

18 U.S.C. §1343 ...............................................................................................24

18 U.S.C. §1962 ...............................................................................................24

18 U.S.C. §1964 ...............................................................................................24

28 U.S.C. §1292 ...............................................................................................20

**Other Authorities**

Fed. R. Civ. P. 23(f) .........................................................................................18

FTC, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating
  Drug Costs and Squeezing Main Street Pharmacies* (2024),
  available at
  https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-
  managers-staff-report.pdf ..............................................................................57

**INTRODUCTION**

GSK's concealment of scientific data showing its diabetes drug, Avandia, presents serious cardiovascular risks remains one of the most significant pharmaceutical frauds in history, resulting in a congressional investigation, a criminal guilty plea, and a $3 billion fine. Plaintiffs represent a class of health plans (third party payors or TPPs) who paid for millions of Avandia prescriptions that would not have been written absent GSK's fraud. The district court carefully vetted plaintiffs' theories of RICO liability, rejected some, and narrowed the case to one: had GSK disclosed its meta-analysis revealing the drug's cardiovascular risks by January 2005, Avandia prescriptions would have declined in the same way they did in 2007 when an independent researcher, Dr. Steven Nissen, published a substantially similar meta-analysis. On appeal, GSK argues that the district court abused its discretion in certifying a class on this theory. GSK is wrong.

*First*, the district court did not abuse its discretion in finding that common issues predominate. There is no dispute that evidence of GSK's fraudulent conduct is class-wide: GSK should have disclosed Avandia's cardiovascular risks in 2005 yet chose to conceal them. Plaintiffs can also prove that GSK's fraud injured each class member using class-wide evidence. The evidence will show that, absent the fraud, the decline in Avandia prescriptions that Nissen's publication precipitated would have begun in January 2005, not mid-2007. Plaintiffs' injury model shows

that each class member reimbursed Avandia prescriptions that, absent GSK's fraud, would never have been written. Unable to explain why plaintiffs' *actual* case does not rely on class-wide theories and evidence, GSK accuses the district court of finding predominance only by inferring that *no* doctor would have prescribed Avandia absent GSK's fraud. That is not plaintiffs' theory, and it was not the basis for the district court's decision.

*Second*, the district court did not abuse its discretion in finding the class ascertainable. Plaintiffs provided robust evidence, in the form of datasets and declarations, that the information necessary to locate and verify class members exists. This is all that this Court's precedent requires. As the district court rightly found, claims administrators routinely use the exact datasets offered here to locate class members and disburse damage awards to similar TPP classes. GSK's contrary arguments turn on misstatements of the record that the district court properly rejected.

## STATEMENT OF THE ISSUES

1.    Whether this Court may limit the scope of its review under Federal Rule of Civil Procedure 23(f).

2.    Whether the district court abused its discretion in finding that plaintiffs can prove fraud and injury with class-wide evidence.

3.    Whether the district court abused its discretion in finding that

plaintiffs' methodology for ascertaining the class was administratively feasible.

## STATEMENT OF THE CASE

### I.  Facts

This Court is familiar with the facts from its prior decisions.[1] Plaintiffs

provide the background specific to this appeal.

### A.  GSK marketed Avandia by touting its ability to reduce cardiovascular risk.

In 1999, FDA approved Avandia to treat type II diabetes. Unlike existing

treatments—which were inexpensive, effective, and boasted long safety records—

Avandia was a new medication that cost nearly $100 more per month.[2] GSK

commanded this premium by marketing Avandia as a drug that would not only

lower diabetics' blood-sugar levels but also their cardiovascular risks.[3] The latter

was a critical selling point: individuals with type II diabetes are at elevated risk of

cardiovascular disease—more than 65% of Americans diagnosed with diabetes will

die of cardiovascular causes.[4] As a result, reduction of cardiovascular risk is a

---

[1] *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015) (*Avandia I*); *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 945 F.3d 749 (3d Cir. 2019) (*Avandia II*).

[2] *See Avandia I*, 804 F.3d at 635; *Avandia II*, 945 F.3d at 753; JA4365-67 (¶¶107-111); JA2074-77.

[3] *Avandia II*, 945 F.3d at 753; *see, e.g.*, JA1375-1469; JA1517-1521; JA1568; JA1565-84; JA3427-28; JA3432; JA3446.

[4] *Avandia II*, 945 F.3d at 753; JA444.

primary goal of diabetes treatment.[5]

## B. GSK knew Avandia had significant, undisclosed cardiovascular risks.

From launch, internal GSK clinical trial data raised concerns that, contrary to GSK's marketing, Avandia actually *increased* cardiovascular risk. For instance, while publicly touting Avandia's ability to improve cholesterol levels, GSK internally acknowledged that its clinical trials showed Avandia worsened total cholesterol—an issue a GSK executive described as "so serious that according to our advisors it could not only affect priority [FDA] review, but could affect the approvability of the compound!"[6] GSK never published these trials because, as a different executive put it, "[t]he[y] put Avandia[sic] in quite a negative light . . . . It is a difficult story to tell and *we would hope that these do not see the light of day*."[7]

Over time, evidence of Avandia's association with adverse cardiac events mounted. In 2001, FDA asked GSK to add a label warning that Avandia increased the risk of fluid retention—an issue that can lead to heart failure.[8] GSK's sales

---

[5] *See In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, No. 09-cv-730, 2013 WL 5761202, at *2 (E.D. Pa. Oct. 23, 2013).

[6] JA3381; *see also* JA3545 (GSK acknowledging internally that this "rise in the LDL:HDL ratio and the Total:HDL ratio . . . may be argued to raise the CV risk to which these patients are exposed").

[7] JA3405 (emphasis added).

[8] *Avandia I*, 804 F.3d at 635.

representatives denied that risk.[9] FDA also instructed GSK to stop minimizing the risk of heart attacks and heart-related diseases in its marketing.[10] Again, GSK did not listen; instead, it instructed its sales force to downplay cardiovascular risks and tout Avandia's purported cardioprotective benefits.[11]

In April 2004, GSK finally formed a team to analyze cardiovascular events across the Avandia clinical trial datasets.[12] By September 2004, GSK completed the statistical analysis of the 37 randomized, controlled trials that were the necessary inputs to this meta-analysis, dubbed "ICT-37."[13] From there, running the meta-analysis should have been straightforward; the evidence shows it should have been completed by January 1, 2005, at the latest.[14] But GSK did not presents the results to its global safety board until September 30, 2005.[15]

The results of ICT-37 were alarming. The study revealed that, in comparison to all pooled controls, Avandia was associated with a statistically significant increase in the risk of *serious* ischemic adverse events—i.e., events where blood

---

[9] *Id.*

[10] *Id.*

[11] *E.g.*, JA3546.

[12] JA3552.

[13] JA4811.

[14] *See, e.g.*, JA1475 (¶777); JA4408 (¶195); JA5616-7.

[15] JA3553.

flow to the heart is compromised (ischemia) causing heart attack, permanent disability, and even death.[16] For myocardial ischemic adverse events (serious and non-serious), ICT-37 found that Avandia was associated with a 29% increase in such events in comparison to all controls.[17]

GSK re-ran its meta-analysis in February 2006, adding data from five more clinical trials.[18] This second study was called "ICT-42." It concluded that Avandia was associated with a statistically significant, 31% increase in myocardial ischemic adverse events (serious and non-serious).[19]

In *Avandia II*, this Court held the evidence supports a finding that GSK could have warned the public of ICT-37's results *right away*.[20] Instead, GSK did not update its label until late 2007.[21]

---

[16] JA1295 (¶466) (reproducing ICT-37's results). GSK misrepresents these results as not statistically significant. GSK Br. 9. When GSK ran the meta-analysis *as it prespecified* for ischemic serious adverse events (for Avandia versus all controls) the results reached statistical significance after 60 days of therapy. JA1295-96 (¶¶466-67); JA2052-53 (¶79).

[17] JA4816. For myocardial ischemic serious and non-serious events, ICT-37 barely missed the statistical significance threshold (the meta-analysis confidence interval was .99, the threshold for statistical significance was 1.0). JA4815-16. Nonetheless, as plaintiffs' expert explained, "any reasonable clinician would have considered these results reliable and taken them seriously." JA4377 (¶146).

[18] JA4811.

[19] JA4816; JA1301-02 (¶¶473, 475).

[20] *Avandia II*, 945 F.3d at 760 ("[I]t appears that GSK could have used the CBE process to add an ischemic-risk warning as early as August 2005.").

[21] *Id.* at 754.

C.   **The public's reaction to the Nissen study reveals what would have occurred in 2005 had GSK disclosed the truth: sales of Avandia would have plummeted.**

In May 2007, Dr. Steven Nissen published a meta-analysis of Avandia clinical trial data that publicly disclosed the very conclusion that ICT-37 and ICT-42 reached, but GSK concealed: Avandia posed significant cardiovascular risks to diabetic patients.[22] Nissen found that, in comparison to all pooled controls, Avandia was associated with a statistically significant, 43% increase in the risk of myocardial infarction (i.e., heart attack) as well as "an increase in the risk of death from cardiovascular causes.'"[23]

Nissen's impact on Avandia's sales was as dramatic as it was predictable[24]:

---

[22] *See infra* n.28 (GSK admissions that Nissen's results mirrored those of ICT-42); *Avandia II*, 945 F.3d at 760 ("by GSK's own admission, ICT-37 and ICT-42 indicated similar results and had clinically insignificant numerical differences"); JA1304-05 (¶480); JA2050-51 (¶¶76-77) (same); JA3027-28 (¶48) (same).

[23] JA443, JA454.

[24] JA978.



Volume of TRx

Source: IQVIA National Prescription Audit (NPA) Data

As this chart shows, prior to Nissen's 2007 meta-analysis, Avandia prescriptions had been level for about three years, with an average of 1.2 million prescriptions per month. After Nissen's publication, prescriptions dropped precipitously, from 1,214,850 per month to approximately 500,000 per month by the end of 2007 and 400,000 by the end of 2008.

Rather than acknowledge that Nissen's findings aligned with GSK's internal results, GSK's marketing team immediately maligned the Nissen study.[25] It issued

---

[25] JA5692-94 (¶¶208-214).

the statement: "GSK strongly disagrees with the conclusions reached in the [Nissen] article, which are based on incomplete evidence and a methodology that the author admits has significant limitations."[26] Internally, however, GSK acknowledged that the Nissen analysis "appears to be thorough" and was based on sound analysis.[27] As GSK's head of research put it: "FDA, Nissen and GSK all come to comparable conclusions regarding increased risk for ischemic events, ranging from 30 percent to 43 percent!"[28] Or, as the Senate Finance Committee put it after its investigation into GSK's fraud, "GSK, as well as the FDA, had also performed their own meta-analyses. Both meta-analyses were consistent with Dr. Nissen's results."[29]

### D. GSK's misconduct led to FDA warnings, a congressional investigation, a guilty plea, and massive civil liability.

GSK's effort to suppress the truth ultimately failed, and GSK accepted a new label warning of cardiac risk.[30] Although FDA initially rejected GSK's proposed label changes due to inadequacies in GSK's submissions,[31] it ultimately ordered

---

[26] JA3548.

[27] JA3571.

[28] *Id.*

[29] *Id.*

[30] GSK Br. 12.

[31] This was not, as GSK suggests (GSK Br. 10-12) because FDA did not see a *need* for any warning. Rather, as this Court found in *Avandia II*, FDA rejected the

GSK to include *more severe* cardiac risk warnings than those GSK initially proposed.[32] Some of these warnings were later removed after highly contentious deliberations at FDA.[33] To this day, however, Avandia's label warns that a meta-analysis found "a statistically significant increased risk of myocardial infarction with AVANDIA versus pooled comparators."[34]

GSK's misconduct was widely recognized by federal and state authorities. For example, a Senate Finance Committee investigation that began in 2008 concluded that "GSK was aware of the possible cardiac risks associated with Avandia years before such evidence became public," violated its "duty to sufficiently warn patients and the FDA of its concerns in a timely manner," and "minimize[d] findings that Avandia may increase cardiovascular risk."[35]

Criminal prosecutions followed. In 2012, DOJ charged GSK with "promot[ing] Avandia . . . with false and misleading representations about Avandia's lipid profile, effect on cardiovascular biomarkers, and the overall safety

---

proposed label only because GSK failed to provide the agency with all information within GSK's possession and failed to "*adequately convey*" the risk. *Avandia II*, 945 F.3d at 754 (quoting FDA's response to GSK); *id.* at 758-60.

[32] *Id.* at 754, 760.

[33] These deliberations largely concerned the RECORD study. GSK attempts to hide behind the RECORD study (GSK Br. at 13-14), but concerns over RECORD's reliability remain. JA2070 (¶106); JA2057-64 (¶¶86-98).

[34] JA4201.

[35] JA3580.

of Avandia . . . ."[36] GSK pleaded guilty to, from 2001 through September 2007, "fail[ing] to make required reporting of data relating to clinical experience and other data and information regarding Avandia, as required by law, to [FDA]."[37] GSK agreed to pay a $3 billion fine based, in part, on its withholding of two Avandia cardiovascular safety studies and an additional $242.6 million fine to settle criminal charges that it concealed data concerning Avandia's cardiovascular safety.[38]

In 2012, GSK also paid more than $657 million to settle federal and state civil cases accusing GSK of falsely promoting Avandia to health care providers.[39] Likewise, it settled scores of personal injury cases brought by patients who suffered adverse cardiac events because of Avandia.

## II. Procedural History

### A. This Court twice allows plaintiffs' RICO claim to proceed.

In May 2010, plaintiffs filed this RICO lawsuit to recover for the millions of Avandia prescriptions that doctors wrote (and plaintiffs reimbursed) because GSK fraudulently concealed Avandia's true cardiovascular profile.

GSK moved to dismiss the complaint, arguing any injury to plaintiffs was

---

[36] JA4175.

[37] JA3950.

[38] JA4167-69.

[39] JA4169.

too indirect to satisfy RICO's proximate-cause requirement. The district court denied the motion, and this Court affirmed on interlocutory appeal.[40] This Court held that TPPs were the "primary and intended victims of the scheme to defraud and their injury was a foreseeable and natural consequence of [the] scheme."[41]

On remand, the district court granted GSK summary judgment, finding plaintiffs' claims preempted by federal law. This Court reversed, holding that GSK was not entitled to preemption because, after learning of Avandia's risks, GSK did not provide adequate information to FDA.[42]

### B. The district court rules on *Daubert* motions and certifies the class.

Plaintiffs moved for class-certification based on two theories of injury. The first theory traced GSK's fraud to 1999. Plaintiffs argued that no doctor would have prescribed Avandia knowing its true risks and, therefore, every Avandia prescription since FDA approved Avandia in 1999 was written in reliance on GSK's fraud.[43]

Plaintiffs' second theory traced GSK's fraud to January 2005—the latest date by which GSK should have disclosed its internal cardiovascular risk analysis. Plaintiffs argued that Nissen's 2007 disclosure of those risks was a

---

[40] *Avandia I*, 804 F.3d at 634.

[41] *Id.* at 645 (quotations omitted).

[42] *Avandia II*, 945 F.3d at 760.

[43] JA0090.

natural experiment that showed what would have happened to Avandia prescriptions starting in 2005 had GSK not fraudulently concealed the risks. Plaintiffs sought to recover for the prescriptions that never would have been written had GSK released its risk information earlier.

GSK opposed class-certification and moved to exclude the testimony of experts Dr. Thomas McGuire and Dr. Meredith Rosenthal, whose testimony was relevant to class-certification. Dr. Rosenthal had performed a regression that sought to quantify the number of Avandia prescriptions that were written based on specific assumptions. Dr. McGuire created two different injury and damages models—one based on Dr. Rosenthal's regression; the second based on using Nissen as a natural experiment, mapping the post-Nissen decline in prescriptions back to GSK's fraudulent concealment in January 2005.[44]

After a full-day *Daubert* hearing, the court substantially pared down both the reports and plaintiffs' associated claims in GSK's favor. In particular, the court agreed with GSK that the record did not support the conclusion that *no* doctor would have prescribed Avandia absent GSK's fraud, and therefore struck the portions of Dr. McGuire's report that calculated injury and damages on that assumption.[45] The court also concluded that Dr. Rosenthal's regression analysis

---

[44] JA0090.

[45] JA0096.

was not reliable, and so struck the portions of her report that conducted the regression and the portions of Dr. McGuire's injury and damages report that relied on Dr. Rosenthal's regression.[46]

The district court, however, *rejected* GSK's challenge to plaintiffs' theory that relied on Nissen as a "natural experiment." GSK had sought to exclude both Dr. McGuire and Dr. Rosenthal's opinions by arguing that the record did not support the facts that: (1) GSK should have disclosed Avandia's risks by January 1, 2005 at the latest; and (2) Nissen was sufficiently analogous to the ICT studies that Nissen could serve as a "natural experiment" for what would have happened to Avandia sales in 2005 absent GSK's fraud.

The court first found that the record could support a jury finding that GSK should have completed ICT-37 by January 2005 at the latest.[47] The court also recognized that the record is replete with evidence that Nissen was analogous to ICT-37, including both unchallenged expert testimony and internal GSK documents cataloging the similarities between Nissen and GSK's meta-analyses.[48]

---

[46] The *Daubert* ruling regarding Dr. Rosenthal is not before this Court.

[47] JA0079-80, JA0093.

[48] *E.g.*, *Avandia II*, 945 F.3d at 760 ("by GSK's own admission, ICT-37 and ICT-42 indicated similar results and had clinically insignificant numerical differences"); JA1304-05 (¶¶480-82) (plaintiffs' expert explaining ICT-42 and 37 reached same conclusion as Nissen); JA3027-28 (¶48) (same); JA2050-51 (¶¶76-77) (same); JA4381-82 (¶153) (same).

Based on this evidence, the court found that whether GSK should have completed ICT-37 in January 2005 and whether Nissen "is similar enough to ICT-37 to act as a sufficient natural experiment" are "fact questions" that "fall within the province of the factfinder."[49]

Thus, after the court's *Daubert* decision, plaintiffs' only remaining injury theory for trial was that: (1) Nissen serves as a "natural experiment" to show the decline in prescriptions that occur upon disclosure of Avandia's cardiovascular risks; (2) had GSK disclosed those risks in January 2005, a significant number of Avandia prescriptions (but not all) would not have been written from January 2005 to mid-2007; and (3) given the magnitude of Avandia use and the significant nationwide decline, all or virtually all TPPs unnecessarily paid for some Avandia during that time.

Based on its *Daubert* ruling, the court then granted class-certification only as to plaintiffs' "claims beginning January 1, 2005"—i.e., plaintiffs' theory that survived *Daubert*.[50] As relevant here, the court first found that common issues predominate. At the class-certification hearing, the court recognized that plaintiffs' remaining theory centers on Nissen, explaining that the theory was to "[s]ubmit [the data regarding Nissen's impact on Avandia prescriptions] to a jury and see

---

[49] JA0093; *see also* JA0081-82.

[50] JA0032.

what they think … because they're not stupid. They're going to figure it out."[51] The court's opinion explained, in detail, how this theory relied on class-wide evidence and documented the class-wide evidence showing GSK's fraudulent scheme to hide Avandia's cardiovascular risks.[52] And the court explained that plaintiffs' theories and evidence of injury and causation would, if accepted by a jury, establish doctors' reliance on a "class-wide" basis without requiring "individualized" doctor-by-doctor analysis.[53] The court also found that the proposed class would be ascertainable under plaintiffs' proposed methodology.[54]

## SUMMARY OF ARGUMENT

1. On the question this Court posed regarding Rule 23(f), the text, the accompanying notes, and the case law make clear that this Court *does* have the discretion to limit its review to a single issue raised in a class-certification order.

2. The court did not abuse its discretion in finding that common issues will predominate at trial. GSK does not dispute that plaintiffs present only class-wide theories and evidence regarding GSK's fraud. And the district court acted well within its discretion in recognizing that plaintiffs' remaining injury and causation theory relies predominantly on class-wide theories and evidence:

---

[51] JA4799.

[52] JA0009-10.

[53] JA0017-18.

[54] JA0024-30.

plaintiffs will use Nissen as a natural experiment to model what would have happened in 2005 absent GSK's fraud. GSK attacks a strawman, arguing that the court erred in inferring that *no* doctor would have prescribed Avandia absent GSK's fraud. But that is not the theory that the court endorsed in its *Daubert* and class-certification rulings.

3.      The proposed TPP class is ascertainable. At certification, plaintiffs need only show that records or reliable affidavits (e.g., affidavits supported by records) that identify class members *can be obtained in the future.* The court credited plaintiffs' evidence that such records can be obtained by all class members. This finding was not an abuse of discretion.

## ARGUMENT

This Court reviews "a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."[55] The two issues GSK presents in its appeal challenge the court's findings of fact that RICO injury may be shown class wide and that the class is ascertainable. Neither finding is clearly erroneous.

---

[55] *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (internal quotation omitted).

## I. This Court may limit the scope of its review under Rule 23(f).

Rule 23(f) gives this Court unfettered discretion to determine what class-certification decisions it will review and how it will structure that review. This includes the discretion to address only a subset of issues raised by a class-certification order. Accordingly, this Court is not required to consider both GSK's predominance and ascertainability arguments in this interlocutory posture.

Rule 23(f)'s text is the starting place for determining the scope of this Court's power under the Rule,[56] and its notes are highly instructive as to its meaning.[57] The Rule's plain language grants this Court complete discretion; it states that "[a] court of appeals may permit an appeal from an order granting or denying class-action certification under this rule," with no restrictions or guidelines.[58] This was purposeful: the Committee intended for courts to determine what "consideration[s]" they find "persuasive" in exercising their "sole discretion," and "to develop standards for granting review that reflect the changing areas of uncertainty in class litigation."[59] As GSK acknowledges, this Court has not limited

---

[56] *See Elliott v. Archdiocese of New York*, 682 F.3d 213, 225 (3d Cir. 2012).

[57] *Waetzig v. Halliburton Energy Servs., Inc.*, 604 U.S. 305, 312 (2025) (notes "a reliable source of insight into the meaning of a rule") (quotations omitted); *Moore v. Walton*, 96 F.4th 616, 624 (3d Cir. 2024) (notes are "of weight in interpreting the meaning of the rules") (quotations omitted).

[58] Fed. R. Civ. P. 23(f).

[59] Committee Note on Rule 23(f).

its Rule 23(f) discretion in any way.[60] Therefore, this Court has discretion to limit this appeal's scope as it sees fit.

This approach is supported by the Committee's statement that discretion under Rule 23(f) is "akin to the discretion exercised by the Supreme Court in acting on a petition for certiorari."[61] Courts look to this authority in developing standards for Rule 23(f) appeals.[62] At the certiorari stage, the Supreme Court often grants a petition "limited to Question 1" or "limited to the following question," thereby narrowing the scope of the issues on review.[63] It sometimes limits the scope of its review at the merits stage, too, including by declining to address a question on which review was initially granted.[64] This Court may do the same here.

GSK's contrary arguments are meritless. GSK suggests that three other circuits have held that a court of appeals *must* consider any "defect" that

---

[60] GSK Br. 54; *see Forsythe v. Teva Pharm. Indus. Ltd.*, 102 F.4th 152, 156 (3d Cir. 2024) ("Crucially, 23(f) was designed to permit appeal in the *sole discretion* of the court of appeals.") (emphasis in original).

[61] Committee Note on Rule 23(f); *Forsythe*, 102 F.4th at 156 (recognizing same).

[62] *See Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 833-34 (7th Cir. 1999).

[63] *E.g.*, *Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1000 (2024).

[64] *E.g., City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 610 (2015).

"implicates the propriety of class certification" in a Rule 23(f) appeal.[65] But two of GSK's three cases involve Article III standing,[66] which is "a necessary threshold issue" to reviewing a class-certification order.[67] In the third case, the court merely held that it had jurisdiction to review "personal jurisdiction and waiver issues" that were part of the class-certification order.[68] In other words, the court held that it *could* review issues the district court addressed, not that it *must*.

GSK likens a 23(f) petition to an interlocutory appeal under 28 U.S.C. §1292(b) and argues that, in that context, a court of appeals cannot limit its review.[69] But Rule 23(f) is not analogous to §1292(b). Rule 23(f) creates a route for interlocutory review *outside* of §1292(b), and its drafters sought to distinguish the two provisions by allowing courts of appeals *greater* flexibility under Rule 23(f) than under §1292(b).[70]

---

[65] GSK Br. 55.

[66] *See Fox v. Saginaw County, Mich.*, 67 F.4th 284, 292 (6th Cir. 2023); *Carter v. W. Pub. Co*, 225 F.3d 1258, 1262-63 (11th Cir. 2000).

[67] *Taha v. Cnty. of Bucks*, 862 F.3d 292, 301 n.4 (3d Cir. 2017) (citation omitted); *see also, e.g.*, *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 319 (5th Cir. 2002) ("[S]tanding may—indeed must—be addressed even under the limits of a rule 23(f) appeal[.]").

[68] *See Moser v. Benefytt, Inc.*, 8 F.4th 872, 875 (9th Cir. 2021).

[69] GSK Br. 55.

[70] *See Microsoft Corp. v. Baker*, 582 U.S. 23, 31 (2017) (describing Rule 23(f)'s drafters' "depart[ure] from the §1292(b) model" by requiring neither district court certification nor adherence to §1292(b)'s other "limiting requirements")

Even accepting GSK's analogy, a court hearing an interlocutory appeal

under §1292(b) "is free to decline to hear some or all the issues the parties raise on

appeal."[71] This Court regularly declines to reach issues on review under §1292(b)

that could be a basis for reversal—including in previous appeals *in this case*.[72]

GSK's §1292(b) cases are not to the contrary. Two of those cases—*Barbato*

and *Griesmann*—state only that the merits panel *may* reach issues outside the

issues certified by the district court or the motions panel, not that they must.[73] The

unreasoned dicta GSK cites in a footnote from this Court's 45-year-old decision in

*Murphy* does not clearly distinguish between issues the Court may and must

---

(quotations omitted); *see also* Committee Note to Rule 23(f) (Rule 23(f) "departs from the §1292(b) model" in "significant ways").

[71] *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1131 (9th Cir. 2022).

[72] *See, e.g.*, *Avandia I*, 804 F.3d at 637 n.11 (declining to address state-law issues); *Miller v. Bolger*, 802 F.2d 660, 666–67 (3d Cir. 1986) (declining to address issue that "involved factual determinations better left to the district court"); *Resol. Tr. Corp. v. Cityfed Fin. Corp.*, 57 F.3d 1231, 1236 n.6 (3d Cir. 1995) (similar), *vacated on other grounds sub nom. Atherton v. F.D.I.C.*, 519 U.S. 213 (1997); *Johnson v. Alldredge*, 488 F.2d 820, 822–23 (3d Cir. 1973) (declining to address certified question of law and fact and "proceed[ing] to a determination of the legal issues raised by the parties").

[73] *See Barbato v. Greystone All., LLC*, 916 F.3d 260, 264 (3d Cir. 2019) ("The scope of our review [under §1292(b)] … is not limited to the question set forth in the certification motion but, rather, includes any issue fairly included within the certified order.") (citation omitted); *Griesmann v. Chem. Leaman Tank Lines, Inc.*, 776 F.2d 66, 70 n.7 (3d Cir. 1985) ("Certification of the questions by the motions panel does not bar our review of the merits.").

address.[74] And *ACRA Turf Club, LLC* is completely inapposite. Discussing *Younger* abstention, it states that federal courts generally must "hear and decide cases within their jurisdiction."[75] But that obligation does not exist where, as here, appellate review is wholly discretionary.

Finally, GSK cites this Court's internal operating procedures (IOPs) for the proposition that a certification under §1292(b) or "similar statute or rule" by a motions panel does not bind the merits panel. Even assuming Rule 23(f) is "similar" to §1292(b), this is irrelevant. No one is suggesting that the motions panel can bind the merits panel (absent some circuit-specific rule enabling it to do so). If a motions panel grants a Rule 23(f) petition limited to certain questions, the merits panel is free to either expand or limit the scope of its review—just like the Supreme Court, after granting certiorari, can add questions or dismiss the case as improvidently granted.[76] At the very least, GSK's concern about the motions panel binding the merits panel has no bearing on *this* case, which is being heard by a merits panel. What rule this Court's IOPs should adopt for *other* Rule 23(f) cases is

---

[74] *Murphy v. Heppenstall Co.*, 635 F.2d 233, 235 n.1 (3d Cir. 1980).

[75] *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 138 (3d Cir. 2014).

[76] *See, e.g.*, *Link v. Mercedes-Benz of N. Am., Inc.*, 550 F.2d 860, 861–62 (3d Cir. 1977) (declining to decide §1292(b) appeal after the motions panel granted certification); *Johnson v. United States*, 574 U.S. 1069 (2015) (ordering the parties to address additional merits question after granting certiorari); *Facebook, Inc. v. Amalgamated Bank*, 604 U.S. 4 (2024) (dismissing certiorari as improvidently granted).

entirely within this Court's discretion.

**II.    The district court did not abuse its discretion in finding that common issues will predominate at trial.**

The court's *Daubert* and class-certification rulings correctly found that plaintiffs can prove their RICO claim on a class-wide basis. GSK ignores plaintiffs' actual class-wide theory and evidence of injury, instead accusing the court of inferring that *no* doctor would have prescribed Avandia absent GSK's fraud. But the court *rejected* that theory and allowed plaintiffs to proceed only on their Nissen-based theory. That theory recognizes that many Avandia prescriptions continued even in the aftermath of the Nissen disclosure. The court thus committed no error.

**A.    The court correctly found that common issues predominate because plaintiffs will present a class-wide RICO claim using Nissen as a natural experiment.**

The predominance requirement looks to whether the "essential elements" of plaintiffs' claim can be proved with "common, as opposed to individualized, evidence."[77] This inquiry "necessarily entails some analysis of whether the proposed class-wide evidence will actually be sufficient for the class to prevail on the predominant issues in the case."[78] But the court, in evaluating predominance,

---

[77] *In re Comm. Bank of N. Va. Mort. Lending Pract. Litig.,* 795 F.3d 380, 399 (3d Cir. 2015) (quotation omitted).

[78] *Harnish v. Widener University School of Law*, 833 F.3d 298, 304-05 (3d Cir. 2016).

need not and should not actually resolve whether the plaintiffs can prove their claim—that is a question for the jury. The question is whether "the plaintiffs' proposed class-wide theories *and* evidence would," if accepted by the jury, prove plaintiffs' case without requiring additional, individualized proof.[79]

The "essential elements" of plaintiffs' RICO claim are well settled: plaintiffs must show that they were injured in their business or property by reason of GSK's use of the mail and wires to execute or attempt to execute a scheme or artifice to defraud.[80] RICO requires that plaintiffs prove that GSK engaged in a pattern of "racketeering activity," and that plaintiffs were "injured in [their] business or property by reason of" that activity.[81] RICO defines "racketeering activity" to include "mail fraud" and "wire fraud" under 18 U.S.C. §§1341 and 1343. Mail and wire fraud, in turn, occur whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail or a wire "for the purpose of executing such scheme or artifice or attempting to do so."[82]

As the court found, plaintiffs will present class-wide evidence to prove GSK's fraudulent scheme to hide Avandia's cardiovascular risks.[83] Plaintiffs will

---

[79] *Id.* at 305 (emphasis in original).

[80] *See Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 647-50 (2008).

[81] 18 U.S.C. §§1962(a), §1964(c).

[82] 18 U.S.C. §§1341, 1343.

[83] JA0008-10.

present evidence that, when Avandia was approved in 1999, GSK needed to convince doctors to prescribe Avandia over more affordable alternatives. GSK did so, in part, by touting Avandia's purported reduction of diabetics' inherent cardiovascular risks. As the district court recognized, however, class-wide evidence shows that, by January 2005 (at the latest), GSK should have known that Avandia was, in fact, associated with significant cardiovascular risks—risks that were particularly alarming given diabetics' inherent cardiovascular vulnerabilities. As the district court explained, the evidence that GSK should have known of Avandia's risks includes "GSK's internal data showing that Avandia increased the incidence of congestive heart failure" and other "negative outcomes"; "[i]nternal emails, presentations, and documents authored by GSK employees and others discussed adverse results from GSK clinical trials"; and "[t]he results of GSK's ICT-37 and ICT-42 and presentations, emails, and documents discussing the adverse cardiac safety signals revealed by these analyses."[84] All of this evidence is class-wide.

The court also correctly found that plaintiffs' theory of injury depends on class-wide evidence because it uses Nissen's mid-2007 publication of Avandia's cardiovascular risks as a "natural experiment" to model what would have happened

---

[84] JA0010.

to Avandia prescriptions had GSK disclosed those risks in early 2005.[85] Courts routinely endorse the use of such "natural experiments," which rely on the consequence of a real event (like Nissen's publication) to model the but-for consequence from an analogous event (like GSK's publication of ICT-37) that should have taken place.[86] For instance, courts in antitrust cases regularly use the actual number of patients who switch to generic pharmaceuticals upon generic launch to model the number of patients who *would* have switched in a world where the generic launched earlier.[87]

The record shows that Nissen serves as a particularly powerful natural experiment here. In the three years leading up to Nissen, Avandia prescriptions were effectively stable at, or slightly over, 1.2 million per month. When Nissen was published in 2007, prescriptions plummeted.[88]

---

[85] JA0089.

[86] *E.g.*, *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1250 (9th Cir. 2020) (crediting use of "natural experiments").

[87] *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 222 (E.D. Pa. 2012); *see also In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 563 (S.D.N.Y. 2021); JA0995 n.71 (Dr. McGuire explaining that this is FDA's preferred methodology).

[88] JA0979



Source: IQVIA National Prescription Audit (NPA) Data

Plaintiffs will prove, at trial, that what happened to Avandia sales following Nissen would have happened in 2005 had GSK disclosed Avandia's cardiovascular risks. Multiple medical experts will testify that the risks Nissen disclosed in 2007 were the same as the risks GSK should have disclosed in 2005.[89] That testimony is corroborated by GSK's own internal documents, which acknowledged that Nissen "appears to be thorough" and reached conclusions that were "comparable" and "similar" to those GSK reached itself in ICT-37.[90]

Strikingly, GSK has never offered an explanation for why sales plummeted

---

[89] JA1304-05 (¶¶480-82) (plaintiffs' expert explaining ICT-42 and 37 reached same conclusion as Nissen); JA3027-28 (¶48) (same); JA2050-51 (¶¶76-77) (same); JA4381-82 (¶153) (same).

[90] JA1331 (¶¶530-31).

following Nissen's publication other than Nissen itself. When the district court pointed that out to GSK's counsel—i.e., that "this sudden decline happens on the heels of Nissen … and the world changed"—GSK's counsel could not identify *anything* that led to this "sudden decline" other than Nissen.[91] Even now, in its 57-page brief, GSK does not offer a single explanation as to why Avandia sales plummeted in 2007 beyond Nissen's publication.

Plaintiffs will also offer other evidence explaining why it makes sense that Nissen would cause Avandia prescriptions to plummet—and why GSK's disclosure in 2005 would have had the same effect. Plaintiffs will introduce evidence that diabetes patients were particularly vulnerable to cardiovascular disease, making doctors prescribing diabetes medications particularly sensitive to cardiovascular risks.[92] And plaintiffs will introduce GSK marketing material that emphasizes Avandia's cardiovascular benefits and GSK marketing analyses showing the impact of that messaging.[93] That evidence supports the conclusion that is self-evident from the sales cliff above: Avandia prescription-writing declined when physicians were informed of Avandia's true cardiovascular risks. Class-wide evidence supports the conclusion that Nissen's publication was not just *correlated*

---

[91] JA4798-99.

[92] JA4339 (¶¶25-27), JA4407-08 (¶¶193-94).

[93] JA1556-58 (¶¶90-98).

with the post-Nissen drop in Avandia prescriptions; it *caused* that drop.

The "natural experiment" based on Nissen will both show that GSK's fraud injured every member of the class and establish damages. Plaintiffs' expert, Dr. McGuire, used the post-Nissen prescription data to model what would have happened to Avandia prescriptions had GSK disclosed Avandia's risks in 2005.[94] That model showed that, had GSK had not fraudulently concealed Avandia's risks, Avandia prescriptions would have decreased by approximately sixty-three percent during the class period.[95] The model suffices to show that every member of the class almost certainly reimbursed *some* Avandia prescriptions that they would not have had GSK disclosed Avandia's cardiovascular risks in 2005.[96] And it shows the total damages to the class from GSK's fraud.[97] All that remains is to calculate each class member's share of the damages, which could be done based on their own individual Avandia payments through the claims process.

GSK will, of course, have defenses to plaintiffs' case, but they are

---

[94] JA0995-96 (¶49).

[95] As Dr. McGuire makes clear (JA0987 (¶31)), the percentage of sales attributable to GSK's fraud under the Nissen "natural experiment" model can be calculated using Table 1 by dividing the value of column (4) by the value of column (2). JA0987 (¶31); JA0997-98 (¶¶53-55, Table 1).

[96] JA0987 (¶31) (a class member who paid for at least 12 Avandia prescriptions during the class period has "a greater than 99.9% probability of suffering damages").

[97] JA0995-98 (¶¶49-55, Table 1).

predominantly (if not entirely) *class-wide* defenses. For instance, GSK will presumably argue, as it did below, that what happened to Avandia prescriptions post-Nissen does not represent what would have happened if GSK told the truth about Avandia in 2005. As the district court found, however, these are "fact questions [that] fall within the province of the factfinder."[98] And, more importantly for these purposes, they are *class-wide* factual disputes: they go to whether Nissen can act as a natural experiment to model what would have happened to prescriptions *for purposes of the class as a whole.*[99]

Crucially, GSK never challenges the district court's finding that the factual question of whether Nissen can serve as a "natural experiment" is a question for the jury. That, alone, is fatal to GSK's predominance argument. If the jury agrees with plaintiffs that what happened post-Nissen would have happened in 2005 absent GSK's fraud, then plaintiffs will have proven injury by class-wide evidence. If the jury agrees with GSK that what happened post-Nissen would *not* have

---

[98] JA0093; *see also* JA0081-82, 88-90.

[99] GSK attempts (at 34-35) to use Dr. Rosenthal's analysis to undermine Dr. McGuire. But GSK convinced the district court to exclude Rosenthal's analysis was unreliable. GSK cannot now invoke it to undermine McGuire's model, which the district court found reliable. Moreover, Rosenthal's analysis was intentionally conservative—*e.g.*, treating all pre-2005 GSK marketing as non-fraudulent— which makes it unsurprising that she underestimated the impact of GSK's fraud. JA4278-79 (¶76), 4279 (n.152). Regardless, this class-wide dispute has nothing to do with predominance.

happened in 2005 absent GSK's fraud, then plaintiffs will *not* have proven injury and GSK will win at trial. But this only underscores that plaintiffs' injury theory is *entirely class-wide*. The district court thus did not abuse its discretion in finding predominance.

### B. This Court's and other circuits' precedents support plaintiffs' class-wide theory of injury.

Precedent from other courts supports plaintiffs' predominance arguments. Three appellate decisions have addressed RICO claims that are similar, in varying ways, to this one: the First Circuit's decision in *Neurontin*[100] and the Second Circuit's decisions in *UFCW*[101] and *Sergeants*.[102] While those cases come out differently based on the specific facts at issue, all three make clear that, in a RICO case, plaintiffs *can* prove injury through third-party reliance on a collective rather than individualized basis.

In *Neurontin*, a class of TPPs sued Pfizer based on its fraudulent marketing of Neurontin for off-label use. The class's injury theory was the same as plaintiffs' here: Pfizer's fraud "caused the plaintiffs to pay for more Neurontin prescriptions

---

[100] *In re Neurontin Marketing and Sales Practices Litigation*, 712 F.3d 60 (1st Cir. 2013).

[101] *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121 (2d Cir. 2010).

[102] *Sergeants Benevolent Association Health and Welfare Fund v. Sanofi-Aventis U.S. LLP.*, 806 F.3d 71 (2d Cir. 2015).

for bipolar disorder than they otherwise would have paid for."[103] The district court rejected the plaintiffs' claims at both class-certification and summary judgment, holding that proving reliance required a "granular doctor-by-doctor analysis."[104] The First Circuit reversed, holding that plaintiffs' "aggregate evidence" and "circumstantial evidence" showing the number of Neurontin prescriptions that doctors would not have written absent Pfizer's fraud provided sufficient class-wide evidence of injury and causation for purposes of both summary judgment and class-certification.[105] This case is largely indistinguishable from *Neurontin*, with the only distinction being that plaintiffs' "aggregate evidence" is the natural experiment of Nissen instead of a regression analysis.

The Second Circuit's decisions in *UFCW* and *Sergeants* reach the opposite conclusion based on the facts at issue in those cases, but their reasoning supports plaintiffs' theory. *UFCW* involved Lilly's drug Zyprexa. FDA approved Zyprexa in 1996.[106] In 2003, FDA disclosed side effects, which led sales to fall by approximately 50 percent over the next five years.[107] Plaintiffs argued that Lilly always knew about those side effects and should have disclosed them. As a

---

[103] *Neurontin*, 712 F.3d at 68.

[104] *Id.* at 66.

[105] *Id.* at 68-70.

[106] *UFCW*, 620 F.3d at 124.

[107] *Id.* at 128.

damages theory, the plaintiffs treated 2006 sales as a floor and argued that *all* prescriptions above that floor going back to the drug's approval in 1996 were "excess prescription[s]" written in reliance on Pfizer's misrepresentations.[108] The Second Circuit held that plaintiffs' damages theory did not allow them to "show proximate cause through generalized proof" given the complications of tying all sales above the 2006 floor to Lilly's misrepresentations—as opposed to other factors that might have influenced a decade of prescriptions.[109]

*Sergeants* involved Aventis's drug Ketek. The plaintiffs alleged that Aventis fraudulently concealed safety concerns with Ketek and, when those concerns were made public, sales dropped. But that sales drop also coincided with significant changes in the relevant market, including a "growing scientific consensus" that the entire field of drugs that included Ketek was "of dubious efficacy in treating Ketek's most popular indications."[110] The sales drop after Ketek's safety concerns were published was also "consistent with the cyclical manner in which sales had declined during the same months the previous year."[111] Despite this, the plaintiffs "made no attempt" to "supply any other information that might render reasonable

---

[108] *Id.* at 135. (internal quotation marks omitted).

[109] *Id.*

[110] *Sergeants*, 806 F.3d at 92.

[111] *Id.* at 93. (citation omitted).

the inference that the drop in sales was actually attributable to the safety disclosures, as opposed to other factors."[112] The plaintiffs' theory was nevertheless that "no reasonable physician" would have prescribed Ketek had they known about its safety concerns.[113] The Second Circuit (like the district court here) rejected that theory because some physicians continued to prescribe Ketek despite its risks.[114]

The Second Circuit went out of its way, however, to emphasize that "it may be possible to demonstrate class-wide RICO causation in a case such as this one by adducing generalized proof from which a reasonable jury could conclude that only *some* prescriptions paid for by each class member were written based on the defendant's alleged misrepresentations."[115] The court explained that, in a "third-party reliance case" involving payers who each "paid for numerous [] prescriptions," the plaintiff class can prove injury "so long as at least some of the prescriptions for which it paid were written in reliance on those misrepresentations."[116] The problem in *UFCW* and *Sergeants*, the court explained, was that the plaintiffs "did not attempt to offer anything beyond mere correlation";

---

[112] *Id.* at 92.

[113] *Id.* at 93.

[114] *See id.* ("Sales did not drop to zero immediately after the FDA issued [its] public health advisory.").

[115] *Id.* at 94.

[116] *Id.*

with "sufficiently powerful aggregate evidence" of injury, plaintiffs would satisfy predominance.[117]

Plaintiffs present *exactly* the type of class-wide injury and causation case that the Second Circuit envisioned in *Sergeants*. Plaintiffs here are not bringing the "all-or-nothing" theory the plaintiffs brought in *Sergeants*;[118] the district court's *Daubert* decision rejected that theory. Nor are plaintiffs here asserting the type of convoluted theory at issue in *UFCW* that involved setting a quasi-arbitrary floor three years after the disclosure and asserting that all prescriptions above that floor going back a decade must have been written in reliance on the fraud.

Instead, plaintiffs are using Nissen's publication in 2007 as a natural experiment to show *exactly* what would have happened to Avandia prescriptions had GSK published the same information in 2005. Plaintiffs' theory thus addresses the argument that doctors prescribe Avandia for multiple reasons: physician prescription-writing that would have continued after disclosure of Avandia's cardiovascular risks is excluded from the claimed injury and, thus, well accounted for in plaintiffs' class-wide theory. Contrary to GSK's brief, it does not matter why doctors would have continued to prescribe Avandia. What does matter is that—as the Nissen evidence shows—GSK's disclosure of Avandia's risks in 2005 would

---

[117] *Id.* at 95, 97.

[118] *Id.* at 94.

have led to a precipitous *decline* in prescription writing.

Plaintiffs have also adduced a host of circumstantial evidence suggesting that the post-Nissen drop in Avandia prescriptions is not a mere "correlation." As *Sergeants* recognized, the "precipitous drop-off in sales" on its own can suggest causation (not just correlation) absent some plausible explanation for the drop beyond Nissen's disclosures.[119] Here, that inference of causation is supported by the cardiovascular risk inherent for diabetes patients, the emphasis GSK's marketing put on cardiovascular safety, GSK's own recognition that its marketing had a significant impact on prescriptions, and the severity of the cardiovascular risks identified in both GSK's and Nissen's meta-analyses.

Ultimately, GSK's attempt to analogize this case to *UFCW* and *Sergeants* requires rejecting the district court's factual finding that whether Nissen provides a valid natural experiment is a fact question for the jury. GSK does not even *try* to challenge that finding—nor could it, given its consistent failure to identify *any* plausible explanation (other than Nissen) for the precipitous fall in Avandia prescriptions. GSK can certainly try to convince the jury that post-Nissen prescriptions are not a valid model for the but-for world in which GSK disclosed

---

[119] *See id.* at 92-93 (noting that for dangerous drugs with serious health risks, "a precipitous drop-off in sales" could prove "class-wide RICO causation" without "individualized inquiries as to physicians' actual reliance").

Avandia's cardiovascular risks. But that would allow GSK to prevail *over every class member*, which only confirms that this is a question for class-wide proof.

This Court's precedent also establishes that plaintiffs can prove reliance on a collective rather than individualized basis. In *Community Bank*, for instance, the plaintiffs brought a RICO claim after paying fees relating to loan servicing for work that had never been performed. This Court held that "reliance may be presumed" because, in effect, no one would ever pay a fee in exchange for "no services"; there was no need for a "loan-by-loan and fee-by-fee analysis."[120] This Court thus recognized that whether a class can prove reliance on a collective rather than individualized basis depends on whether the class-wide evidence permits an inference that the group at issue did, in fact, rely on the misrepresentation.

*Harnish*[121] is not to the contrary. There, the plaintiffs argued that the law school inflated tuition by publishing fraudulent post-graduation employment rates. This Court denied class-certification because the statutes at issue did not permit a "price-inflation theory."[122] That holding is irrelevant here.

In explaining why reliance was *irrelevant* in *Harnish*, this Court noted that

---

[120] *Community Bank*, 795 F.3d at 408.

[121] *Harnish v. Widener University School of Law*, 833 F.3d 298 (3d Cir. 2016).

[122] *Id.* at 312-13.

"reliance is nearly always an individualized question."[123] As the district court recognized, however, that observation has no bearing here. *Harnish* was a first-party reliance case in which the plaintiff class, if it had to prove reliance, would have had to prove that *every class member* relied on the school's fraudulent publication—a task that would have been difficult on a class-wide basis. In a third-party reliance case like this one, plaintiffs only need to prove that they were *injured* by *others'* reliance. As *Sergeants* recognized,[124] that does not require identifying the precise doctors that relied on GSK's fraud. It requires proving the quantitative effect of GSK's fraud on class members' total prescriptions—i.e., *how many* prescriptions would not have been written absent GSK's fraud. The Nissen evidence proves exactly that on a class-wide basis.

## C. GSK's brief misrepresents the district court's decision in crucial ways.

Rather than engage with plaintiffs' actual class-wide RICO theory, GSK spends most of its brief attacking a caricature of the district court's *Daubert* and class-certification decisions. First, GSK accuses the court of invoking a "class-wide inference of reliance," by which GSK appears to mean that the court assumed that *every* doctor relied on GSK's misrepresentations. Second, GSK accuses the

---

[123] *Id.* at 309.

[124] 806 F.3d at 93-94.

court of not relying on the post-Nissen decline in sales in its class-certification order. Both characterizations are critical to GSK's brief—and both are wrong. In particular, they fail to read the district court's interconnected *Daubert* and class-certification decisions together.

### 1. The district court never invoked an inference that *every* doctor relied on GSK's misrepresentations.

GSK's primary argument is that the district court impermissibly gave plaintiffs the benefit of a "class-wide inference of reliance." But the Supreme Court held in *Bridge* that reliance is not an element of a RICO claim; RICO plaintiffs need only show that they were *injured* by defendants' fraud.[125] Consistent with *Bridge*, plaintiffs do not argue that *they* relied on GSK's fraud. Plaintiffs were injured by having to reimburse Avandia prescriptions that doctors would not have written absent GSK's fraud. The notion of a "class-wide inference of reliance" makes little sense where the class does not need to prove—and is not trying to prove—*its own* reliance.

GSK's actual argument, properly understood, is therefore not about reliance but *injury and causation*. Plaintiffs' theory of injury requires that plaintiffs prove that most Avandia prescriptions during the class period would not have been

---

[125] *Bridge*, 553 U.S. at 648-49, 653-54. Plaintiffs also need to show that GSK's fraud proximately caused their injury, but this Court already held that the causal chain at issue satisfies RICO's directness requirement. *Avandia I*, 804 F.3d at 645-646. The First Circuit reached the same decision. *Neurontin*, 712 F.3d at 66-68.

written (and thus paid for) had GSK disclosed the truth about Avandia's cardiovascular risks in 2005. GSK accuses the district court of finding predominance only by giving Plaintiffs the benefit of a "class-wide inference" that "*all* Avandia prescriptions were written in reliance on the allegedly fraudulent cardioprotective promotion."[126]

But the district court invoked no such inference. The district court's *Daubert* ruling rejected plaintiffs' argument that no doctor would have prescribed Avandia had GSK disclosed the truth about its cardiovascular risks.[127] The theory the district court endorsed in its *Daubert* decision—and the only theory plaintiffs intend to assert at trial—is the theory that uses Nissen as a natural experiment to prove what would have happened had GSK disclosed Avandia's cardiovascular risks in 2005.[128] The district court's class-certification decision again rejected the theory that *no* doctor would have prescribed Avandia "had GSK been honest about the drug's true cardiac profile."[129] And the court repeatedly acknowledged that plaintiffs' theory is that GSK's misrepresentations forced plaintiffs to reimburse

---

[126] GSK Br. 26-27 (emphasis added).

[127] GSK Br. 27 (quoting JA95-96).

[128] JA93-95.

[129] JA13.

"more prescriptions than they would have absent the representations"—not a theory in which *no* doctor would *ever* have prescribed Avandia.[130]

The district court's predominance analysis also considered plaintiffs' *other* class-wide evidence supporting an inference that doctors who stopped prescribing Avandia post-Nissen did so because they had relied on GSK's fraudulent concealment of Avandia's risks. This "common evidence" included "GSK's own analyses of the impact of its promotion on prescription volume, its marketing materials and strategic planning documents, and testimony from GSK employees regarding the success of its marketing."[131]

GSK seizes on the court's use of the phrase "class-wide reliance" as evidence that the district court inferred that *all* doctors relied on GSK's misrepresentations. But while the district court perhaps could have been more precise, the only coherent way to read the court's use of the phrase "class-wide reliance" is in contrast to doctor-by-doctor reliance—i.e., the court held that plaintiffs' evidence about GSK's marketing and internal studies could be used to prove that some *group* of doctors, collectively, relied on GSK's misrepresentations. The district court could have meant nothing else. The word "class" cannot refer to the plaintiff class, which is not arguing that it relied on

---

[130] JA15.

[131] JA12.

anything. And it cannot refer to *all* doctors because the district court held that *all* doctors did *not* rely on GSK's misrepresentations. The court's point was simply that both the law and the record here permit plaintiffs to prove reliance on a collective, not a "granular doctor-by-doctor," basis.[132] The relevant group of doctors here, as the court's *Daubert* decision makes clear, are the doctors who stopped prescribing Avandia post-Nissen.

The district court's discussion of the First Circuit's *Neurontin* decision confirms this. As discussed, the plaintiffs' theory in *Neurontin* was identical to plaintiffs' theory here: TPPs were harmed because, absent the defendant's fraudulent marketing, many *but not all* prescriptions would not have occurred. The district court described *Neurontin* as premised on "class-wide reliance" because the plaintiffs there sought to prove that a *group* of doctors relied on the defendant's misrepresentation. That is all the court meant here.

> ### 2. The district court considered the post-Nissen sales decline as important class-wide evidence of injury.

GSK's brief predicts that plaintiffs will "likely eschew defending the class-wide inference of reliance" and instead rely on the post-Nissen drop in sales to "salvage" the district court's decision.[133] In reality, though, the district court

---

[132] *Neurontin*, 712 F.3d at 66.

[133] GSK Br. 32.

plainly understood Nissen's key role in plaintiffs' theory.

The entire point of the court's *Daubert* ruling was to focus plaintiffs' RICO claim on a theory that depended on the "natural experiment" of Nissen's 2007 publication. The fact that the class-certification ruling built on the *Daubert* ruling without repeating it does not mean that the district court suddenly forgot that the post-Nissen decline in sales was the key, class-wide evidence for the "natural experiment" on which plaintiffs' injury claim rests.

The class-certification hearing makes clear that the district court did not ignore Nissen—it simply assumed that the post-Nissen decline in sales was the backdrop for plaintiffs' other class-wide evidence. At the end of the class-certification hearing, when GSK's counsel was arguing about predominance, the court interrupted to emphasize the importance of the natural experiment Nissen presents, explaining that "it's a study that came out and the world changed."[134] And when GSK's counsel responded that Nissen only showed "correlation," not causation, the district court reiterated its *Daubert* ruling that this was a question for the jury: "Submit that to a jury and see what they think … because they're not stupid. They're going to figure it out."[135] Again, GSK does not challenge the

---

[134] JA4797.

[135] JA4799. GSK relies on a footnote in the district court's decision noting that the court had not admitted plaintiffs' damages expert's testimony as "evidence of

court's finding that the jury should decide whether Nissen serves as a valid natural experiment. And GSK's suggestion that the court simply forgot about the key piece of evidence that the court planned to submit to the jury defies credulity.

### D. GSK's internal marketing analyses and oral statements provide class-wide support for plaintiffs' RICO claim.

The district court correctly recognized that GSK's trumpeting of Avandia's cardiovascular safety in its written and oral marketing as well as GSK's internal market analyses provide persuasive evidence that GSK's fraud injured TPPs as a class. As explained, plaintiffs plan to use that evidence as the context for the stunning disclosure of Avandia's true risks, supporting a finding that the post-Nissen drop in sales was not merely a coincidental "correlation" with Nissen's publication.

GSK's response again mischaracterizes the district court's decision. GSK accuses the court of ignoring this evidence and assuming that "all physicians prescribed Avandia for reasons having to do with cardiovascular health."[136] But, again, the district court *rejected* the argument that *all* physicians prescribed Avandia based only on cardiovascular health. This evidence merely supports the

---

reliance." GSK Br. 33 (quoting JA16 n.64). But as the district court's statement at the hearing implies, the post-Nissen sales data *itself* is strong evidence of causation even without any expert report.

[136] GSK Br. 41.

inference that *some* doctors cared about Avandia's cardiovascular effects enough to alter their behavior and that the natural experiment based on Nissen fairly estimates the magnitude of that cohort.

With this evidence's role in plaintiffs' theory correctly understood, there is little left of GSK's arguments. For instance, GSK complains that its oral marketing statements on which plaintiffs rely were not "uniform" and thus cannot support an inference that *every* Avandia prescription was written in reliance on GSK's fraud.[137] And GSK argues that its marketing analyses did not isolate the impact of its cardiovascular marketing and hence cannot be used to calculate the number of prescriptions that were written in reliance on GSK's fraudulent scheme.[138] But plaintiffs are relying on Nissen as a natural experiment to prove their injury from GSK's fraud—not the oral statements or marketing analyses. The oral statements and marketing analyses serve the much more limited purpose of supporting the inference that it was Nissen's publication of Avandia's cardiovascular risks that caused the subsequent drop in sales—not some other (unspecified) event.

GSK is obviously wrong in asserting that this Court, in *Avandia II*, precluded plaintiffs from characterizing "the alleged fraud as an omission of safety

---

[137] GSK Br. 40-42.
[138] GSK Br. 35-38.

information."[139] The relevant part of *Avandia II* rejected GSK's argument seeking to restrict plaintiffs' arguments. The question before this Court was whether the district court needed to consider plaintiffs' arguments that "GSK marketed Avandia as providing cardiovascular *benefits*."[140] This Court held that plaintiffs had consistently made that argument.[141] This Court recognized that plaintiffs' allegations that "GSK failed to warn of Avandia's true cardiovascular *risk*" supported plaintiffs' argument that GSK marketed Avandia as providing cardiovascular benefits.[142] But nothing in this Court's decision precludes plaintiffs from arguing that GSK's decision to conceal Avandia's true cardiovascular risks constitutes fraud. That was simply not the question before this Court in *Avandia II*.

### E. To the extent GSK has any individualized defense, it does not predominate.

GSK asserts that it will introduce "individualized rebuttal evidence" in the form of "testimony from specific physicians who prescribed Avandia for reasons having nothing to do with the alleged fraud."[143] GSK relies on testimony from "four physicians" and asserts that, at trial, it would introduce "similar testimony

---

[139] GSK Br. 38-40, 42.

[140] *Avandia II*, 945 F.3d at 762.

[141] *Id.*

[142] *Id.*

[143] GSK Br. 42-43.

from additional prescribers."[144] Of those four physicians, however, one had "never prescribed Avandia to my patients"[145]; one stopped prescribing Avandia because of "potential cardiovascular issues"[146]; and a third never testified that she would have prescribed Avandia had she known of its cardiovascular risks.[147] The district court was well within its discretion to conclude that GSK's failure to muster anything beyond these four physicians "over nearly two decades of litigation" highlights that GSK does *not* have a meaningful individualized defense.[148]

In any event, this evidence is not *individualized* because, assuming it shows anything relevant at all, it is something relevant to *every plaintiff's case*. Again, plaintiffs' theory is that *some*—but not all—doctors would have cared enough about Avandia's cardiovascular risks to change their behavior. The Nissen evidence demonstrates the aggregate magnitude of that cohort: around 63 percent of prescriptions would not have been written during the class period absent GSK's fraud, meaning that around 37 percent would still have been written. Thus, testimony from some doctors that they would have continued prescribing Avandia had they known the truth in 2005 is both unsurprising and perfectly consistent with

---

[144] GSK Br. 43.

[145] JA2556.

[146] JA3274.

[147] JA782-867.

[148] JA17-18.

plaintiffs' theory.

Finally, GSK has offered no testimony from doctors who stopped prescribing Avandia post-Nissen for some reason other than Nissen. This dearth of evidence reinforces GSK's failure to offer any explanation for the post-Nissen decline in sales beyond Nissen's publication of the cardiovascular risks that GSK fraudulently concealed.

*　　*　　*

Ultimately, the predominance issue is straightforward. Plaintiffs rely entirely on class-wide evidence both (1) to establish GSK's fraud and (2) to prove that GSK's fraud injured each class member by using Nissen's 2007 publication as a natural experiment to show what would have happened in 2005 absent GSK's fraud. The district court's findings that a reasonable jury could conclude that GSK should have disclosed Avandia's risks in 2005 and that Nissen serves as a valid natural experiment are not clearly erroneous. This Court should affirm.

## III. The Avandia TPP class is ascertainable.

### A. Ascertainability neither requires presentation of all records nor precludes individualized review.

This Court's ascertainability requirement comes from *Marcus v. BMW*, where the Court held "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is

inappropriate."[149] In *Marcus*, there were serious questions about whether there were *any* records from which the class could *ever* be identified. GSK misreads *Marcus* to require that plaintiffs present all records from which the class can be ascertained at the certification stage and to preclude any individual verification. This Court has repeatedly rejected both arguments.

In *Byrd v. Aaron's Inc.*, for instance, the Court considered class definitions that included computer lessees and/or purchasers and their household members.[150] This Court agreed with plaintiffs that the defendant had records identifying the lessees/purchasers and that they could ascertain household members based on personal and public records.[151] The Court did not require plaintiffs to introduce, at the class-certification stage, the actual records for household members. "[T]he household class members were ascertainable even though *no evidence as to them* had been submitted because we could *imagine* the types of evidence that could be identified and used to link the existing class members to household members."[152]

---

[149] *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

[150] *Byrd v. Aaron's Inc.*, 784 F.3d 154, 160 (3d Cir. 2015), *as amended* (Apr. 28, 2015).

[151] *See id.* at 169.

[152] *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 480 (3d Cir. 2020) (citing *Byrd*, 784 F.3d at 170-71) (emphases added); *see Kelly v. RealPage Inc.*, 47 F.4th 202, 223 (3d Cir. 2022) (*Byrd* held "ascertainability satisfied by the prospect of matching addresses from multiple as-of-yet unknown sources").

And this Court recognized that "the size of a potential class and the need to review individual files to identify its members are not reasons to deny class-certification."[153]

In *City Select Auto Sales Inc. v. BMW of North America*, this Court vacated "a district court ruling that a proposed class of car dealers who received unsolicited faxes from a credit agent was not ascertainable because a database of the dealers did not list which ones actually received the fax."[154] This Court held that "[a]ffidavits, in combination with records or other reliable and administratively feasible means," including the database, "[met] the ascertainability standard."[155]

In *Hargrove*, this Court rejected a district court's holding that "essentially demanded that Appellants identify the class members at the certification stage."[156] Despite plaintiffs' concededly incomplete records (the plaintiffs only presented a sample), the Court held the plaintiffs sufficiently "identified several distinct data sets that, *taken together with the affidavits*, establish a 'reliable and administratively feasible mechanism' for determining class membership."[157]

---

[153] *Byrd*, 784 F.3d at 171 (quotation marks omitted).

[154] *Hargrove*, 974 F.3d at 478 (citing *City Select Auto Sales Inc. v. BMW of N. Am.*, 867 F.3d 434, 441 (3d Cir. 2017)).

[155] *City Select*, 867 F.3d at 441.

[156] *Hargrove*, 974 F.3d at 470.

[157] *Id*. at 480 (quoting *Byrd*, 784 F.3d at 163) (emphasis added).

In *Kelly v. RealPage Inc.*, too, this Court reversed a district court on ascertainability grounds, this time with an even larger class (16,659 consumers).[158] The district court held that identifying class members was "not administratively feasible" because it required complex mapping of information across two databases.[159] In reversing, this Court explained that a "straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources."[160] "To hold otherwise," this Court wrote, "would be to categorically preclude class actions where defendants purportedly harmed too many people[.]"[161]

Together, these cases establish two principles: (1) at the class-certification stage, plaintiffs need not present all records or affidavits from which class will be ascertained if reliable sources exist, and (2) a class consisting of thousands of members can be ascertained even where the identification process requires review of individual records, so long as that review process yields yes-or-no answers.

---

[158] *Kelly*, 47 F.4th at 209.

[159] *Id.* at 210.

[160] *Id.* at 224.

[161] *Id.* at 225.

**B.     The district court's finding on ascertainability is not clearly erroneous.**

Applying these principles, the district court did not abuse its discretion in finding that the class here is ascertainable.[162] The court accepted the plaintiffs' reasonable two-step process for identifying TPPs that paid for Avandia.[163]

*First*, plaintiffs will use three objective datasets—a comprehensive TPP database,[164] IQVIA purchase data,[165] and GSK rebate records[166]—to capture the full universe of potential class members. The class administrators who maintain the TPP databases have already submitted declarations describing those databases, and the IQVIA data and rebate records have been produced.[167]

*Second*, after judgment, TPPs will submit claims data proving their Avandia purchases to confirm their class membership. Fully insured plans will not have those records because they make no purchases. By contrast, self-funded plans can

---

[162] *See Hydrogen Peroxide*, 552 F.3d at 320.

[163] The class definition is provided at JA0002-03.

[164] This database is compiled from reliable sources, include the filings TPPs must make with the federal government and TPPs who have been identified through similar pharmaceutical class actions. JA1851-52; JA25.

[165] JA1852; JA25. Courts have repeatedly credited IQVIA (formerly, IMS) as the "gold standard" data source. *E.g.*, *In re Actiq Sales & Mktg. Pracs. Litig.*, 2014 WL 3572932, at *10 (E.D. Pa. July 21, 2014).

[166] GSK's own records list entities that received rebates for their purchases of Avandia during the class period. JA1852; JA25.

[167] JA0929, JA931-33; JA1852.

access claims data showing the drugs they purchased, their cost, and any cost-sharing. Pharmaceutical companies, pharmacies, PBMs, insurers, and consumers all depend on this claims data to allocate costs accurately. Its reliability is undisputed, and because the data is so economically valuable, PBMs, pharmacies, insurers, and auditors routinely "archive" it and keep it "accessible indefinitely."[168]

GSK attempts to rebrand this second-step as allowing identification based on mere "say-so," seizing on plaintiffs' shorthand reference to claims submissions as "affidavits."[169] Not so. As the district court correctly recognized, here, "class members—originally identified by objective, third party data—will corroborate their class membership via commercial purchase history based on their ordinary business records."[170]

This Court has found ascertainability based on far less. In *City Select*, affidavits alone—not verified by any records—sufficed to establish which entities within a database received the faxes at-issue.[171] Here, the plaintiffs' methodology

---

[168] *See In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 400 (D.R.I. 2019) (citing expert report); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, 2020 WL 5778756, at *8 (E.D. Va. Aug. 14, 2020) (concluding that "declarations from a handful of the largest PBMs . . . confirm[] that such data exist" and citing to a declaration from Express Scripts (ECF No. 730-16) to support this statement), *report and recommendation adopted*, 2021 WL 3704727 (E.D. Va. Aug. 20, 2021).

[169] JA2176.

[170] JA28-29.

[171] *City Select*, 867 F.3d at 442.

resembles that approved in *RealPage*: objective datasets identify the universe of potential class members, which is then narrowed through data cross-checking.[172]

Plaintiffs proved to the district court these objective datasets *exist* and can reliably *identify* class members.[173] Multiple plaintiffs have already produced their Avandia claims data, demonstrating that such records work to identify class members.[174] After judgment, other class members will do the same.[175]

Plaintiffs also submitted a declaration from Rawlings Analytics—an established healthcare claims recovery company—verifying that it currently stores claims data for over *$200 million worth of Avandia purchases* for the period spanning January 1, 2004 through August 14, 2007.[176] Rawlings analyzes the claims data of health insurers,[177] has access to over 300 million Americans' drug claims data,[178] and confirmed that it can identify whether a plan is self-funded or fully insured for the dataset of Avandia purchases—all with documentation.[179]

Finally, the court correctly observed (and GSK now ignores) that for

---

[172] *See Kelly*, 47 F.4th at 223-24.

[173] JA25-30.

[174] JA29-30; *see also* JA4622-23 (¶15); JA4633 (¶17).

[175] JA1854-55 (¶¶11-14)

[176] JA4637-4643; JA4638(¶8).

[177] JA4637-38 (¶¶2-10)

[178] JA4638 (¶6).

[179] JA4638 (¶9).

decades courts have approved damages disbursements using precisely this methodology.[180] The two leading claims administrators in the pharmaceutical class action space (A.B. Data and Rust) both aver that they regularly use exactly the type of data and methodology proposed here to ascertain and then repay *billions* to TPP classes.[181]

### C. Plaintiffs need not present all data now, and individualized inquiry is no bar to certification.

GSK makes two arguments it barely mentioned below. Neither has merit.

### 1. The district court did not abuse its discretion in finding plaintiffs have produced sufficient evidence that the datasets exist.

The district court acted well within its discretion in rejecting GSK's argument that the relevant data does not exist.

*First*, GSK has no support for its assertion that Express Scripts lost all access to its pre-2008 claims data. GSK's argument rests entirely on its own expert's characterization of an informal discovery email between J.B. Hunt's counsel and an unknown Express Scripts employee—an email that is not itself in the record before the district court or this Court.[182]

---

[180] JA26 (district court decision listing seven exemplar cases where courts approved settlements with similarly defined TPP classes).

[181] JA929-944; JA1850-76.

[182] GSK Br. 46 (citing JA2656).

The court was not required to credit GSK's expert's characterization of this email. For one thing, GSK's description of the email conflicts with other courts' consistent recognition that claims records "are archived and accessible indefinitely" by PBMs—*including Express Scripts*—due to their strong economic incentives to keep this data.[183] Declarations from Express Scripts submitted in other TPP class actions make clear that Express Scripts "maintains records of claims that can be provided to its Clients."[184] That email addressed only whether Express Scripts could easily produce the data during informal discovery—not whether the data was forever irretrievable or could be produced after compulsory process. The record shows that Express Scripts *can*, if needed, retrieve the data. Another plaintiff, UBF, was able to use a subpoena to obtain its claims data from Express Scripts *for 2002-2009*.[185] Finally, there is no evidence that the unnamed Express Scripts employee at issue had any knowledge of Express Scripts' archival data retention policies. For all these reasons, the district court's decision not to credit GSK's expert's claim regarding Express Scripts' data is entirely reasonable—and certainly not clearly erroneous.

---

[183] *Loestrin*, 410 F. Supp. 3d at 400; *see also supra* n.168168168.

[184] *E.g.*, Declaration of Non-Party Express Scripts, Inc. at ¶¶7-8, *In re Restasis Antitrust Litig.*, E.D.N.Y. No. 18-md-2819, ECF No. 396-4 at 588-589 (Oct. 9, 2019); *see also Zetia*, 2020 WL 5778756, at *8 n.10 (looking to PBM declarations in other cases, including from Express Scripts).

[185] *See* JA5854-55; JA2449-50.

GSK also misstates the importance of Express Scripts' data retention policies. GSK claims that Express Scripts held 40% of the market in the class period (2005-2007). That is based on nothing in the record and demonstrably false. As a 2024 Federal Trade Commission report on PBMs explains, in 2004, Express Scripts only had 14% of the market.[186]

*Second*, GSK errs in implying that two TPPs (Allied and UBF) decided not to pursue their claims in this case because they could not obtain their purchase records.[187] Not so. Allied and UBF dropped their claims because they could not obtain their purchase records *in the brief window* the Special Master gave them to obtain this data.[188] Notably, one of these TPPs later produced the very Avandia claims data GSK now claims does not exist.[189]

*Third*, even if some TPPs could not find Avandia-specific claims data, the possibility of unclaimed damages poses no barrier to certification. Of course, the issue only arises if the amount of the judgment *res* exceeds the documented claims (a rare event). Even then, courts routinely handle unclaimed damages through

---

[186] FTC, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* at 5 (2024), available at https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

[187] GSK Br. 47.

[188] JA5713.

[189] *See* JA5854-55; JA2448-50.

"reversion to the defendant, escheat to the state, or distribution of the funds *cy pres*."[190] That settled practice defeats GSK's suggestion that the mere possibility of unclaimed damages somehow "gut[s]" the ascertainability requirement.[191] Were it otherwise, few classes could ever be certified.[192]

### 2. Plaintiffs have shown that class members can document their self-funded status.

GSK also asserts that health plans do not know whether they pay for their members' drug and medical claims or whether some other insurer does. GSK never directly made this argument below and it is therefore waived.

Regardless, this argument makes no sense—it is akin to arguing that an individual doesn't know whether they were paying with their own credit card at the pharmacy counter. As claim administrator Eric Miller explained in his deposition, self-funded plans generate receipts of their drug purchases, while fully-insured plans do not "because they d[o]n't make any purchases."[193] For this reason, both

---

[190] *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013).

[191] GSK Br. 48.

[192] In *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013), on which GSK relies (at 48-49), there was "no evidence that a 'single purchaser,' let alone the whole class, could be identified using [the records plaintiffs proposed rely on to locate class members]." *Hargrove*, 974 F.3d at 478 (quoting *Carrera*, 727 F.3d at 309). "Remarkably, even the named plaintiff could not recall whether he had purchased the diet supplement." *Byrd*, 784 F.3d at 164 (citing *Carrera*, 727 F.3d at 311 n.9).

[193] JA3245.

Mr. Miller and Ms. Lake (two of the leading pharmaceutical class action claims administrators) testified that they have *never* "encountered a situation where an entity was not able to accurately and reliably identify itself as self-insured versus fully insured."[194]

Courts have long recognized the same. Numerous decisions hold that TPPs can substantiate their self-funded status with their own claims data.[195] Even experts hired by GSK's counsel in other TPP class actions have admitted that "insurers are always able to differentiate between fully insured and self-funded plans."[196]

Plaintiffs offered further unrebutted proof of this fact in the form of a declaration from the president of Rawlings (Mr. Fischer). As Mr. Fischer averred, "[f]or this dataset of Avandia purchases, Rawlings can identify which purchases were made by TPPs included in the class definition plaintiffs' counsel provided me. With respect to the identity of the TPP payer for a given drug purchase, Rawling can identify … the name of the insurer, the specific plan name, and

---

[194] JA3245; *see also* JA1855; JA4650 (¶16).

[195] *See, e.g.*, *Gov't Employees Health Ass'n v. Actelion Pharms. Ltd.*, 2024 WL 4122123, at *12 (D. Md. 2024) ("TPPs' own records" data can separate class from non-class members); *Zetia*, 2020 WL 5778756, at *12; *In re Ranbaxy Antitrust Litig.*, 338 F.R.D. 294, 308 (D. Mass. 2021).

[196] *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 754567, at *24 (E.D. Pa. 2025).

whether that plan is self-funded or fully insured—all with documentation."[197] GSK

made no effort to contest this evidence before the district court.

Unable to counter that record, GSK falls back on the claim it did press

before the district court: that class members' affidavits were mere "say-so."[198] That

argument rests on a snippet of deposition testimony, where GSK's counsel inserted

the phrase "say-so" into a question to Miller:

> Q. So it essentially relies on the say-so of each plan as to whether or
> not they are self-insured or fully insured; right?
>
> A. To the extent, yes, they, that would be the initial passes for them to
> decide -- well, not decide themselves, to -- because they would know if
> they are fully insured or self-funded.[199]

By injecting the word "say-so" into its questions, GSK's counsel teed itself up to

argue that Mr. Miller "admitted" that TPPs' claims regarding their insurance status

are "say-so." Read in full, however, Miller's testimony confirms the opposite:

TPPs are "not decid[ing] themselves" whether they are self-funded, they "know"

their status because they have claims data to prove it.[200] While the "initial step" is

the TPP coming forward as self-funded, that claim is then verified through claims

---

[197] JA4638 (¶9).

[198] GSK Br. 50.

[199] JA3241.

[200] JA3245.

data or plan documents as the second step.[201] Indeed, both class representatives substantiated their self-funded status not just with claims data, but through plan documents "filed annually with the Department of Labor each year to show self-insured status under ERISA."[202]

*Niaspan*'s holding is inapposite here. That case did not conclude that TPPs are sometimes unable to substantiate whether they are self-funded or fully insured. Instead, this Court held that the district court's "factual finding" that *PBM data alone* cannot always reliably identify whether a TPP is self-funded or fully insured was "not clearly erroneous."[203] This fact is not at issue here: the plaintiffs have never claimed that TPPs' insurance status can or should be identified from PBM data *alone*. The district court's factual finding that claims data and other plan documents can reliably determine TPPs' self-funded status is not clearly erroneous.

## CONCLUSION

This Court should affirm.

Dated: September 8, 2025

Respectfully Submitted,

/s/ Thomas M. Sobol
Thomas M. Sobol
Erin C. Burns
Hannah W. Brennan

---

[201] JA3241.

[202] JA4621 (¶4); JA4630 (¶2) (same).

[203] *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 136 (3d Cir. 2023)

HAGENS BERMAN SOBOL SHAPIRO
LLP
One Faneuil Hall Square, 5th Fl.
Boston, MA 02109
Tel: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
erinb@hbsslaw.com
hannahb@hbsslaw.com

James R. Dugan, II
David S. Scalia
DUGAN LAW FIRM APLC
One Canal Place – Suite 1000
365 Canal Street
New Orleans, LA 70130
Tel: (504) 648-0180
Fax: (504) 648-0181
jdugan@dugan-lawfirm.com
dscalia@dugan-lawfirm.com

*Lead Counsel*

A.J. de Bartolomeo
KAPLAN FOX & KILSHEIMER LLP
1999 Harrison St, Suite 1501
Oakland, CA 94612
Tel: (415) 772-4700
Fax: (415) 772-4707
AJD@kaplanfox.com

*Counsel for Plaintiff-Appellee J.B.
Hunt Transport Services, Inc.*

Eric L. Young
MILLER SHAH LLP
1845 Walnut St, Suite 806
Philadelphia, PA 19106
(866) 540-5505

*Counsel for Plaintiff-Appellee United*
*Food and Commercial Workers Local*
*1776 and Participating Employers*
*Health and Welfare Fund*

David J. Zimmer
Edwina B. Clarke
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421

Julia A. Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
1629 K St. NW, Suite 300
Washington, D.C. 20006
(617) 676-9410

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c)(1) because it contains 12,907 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately-spaced typeface using Microsoft Word in Times New Roman, 14-point font for text and footnotes.

3.     The undersigned certifies, in accordance with Local Rule of Appellate Procedure 28.3(d), that he is a member of the Bar of the United States Court of Appeals for the Third Circuit, having been admitted on July 20, 2015.

4.     The electronic version of this brief was checked for computer viruses using Crowd Strike. No computer virus was detected.

5.     The hard copies of this brief are identical to the electronically filed version.

*/s/ Thomas M. Sobol*
Thomas M. Sobol

## CERTIFICATE OF SERVICE

I, Thomas M. Sobol, certify that, on this date, the foregoing document was served by filing it on the court's CM/ECF system and additionally via electronic mail to all counsel of record.

Dated: September 8, 2025        HAGENS BERMAN SOBOL SHAPIRO LLP

                                          */s/ Thomas M. Sobol*
                                          Thomas M. Sobol